THE LAKME.

THE TYEE.

THE QUEEN ELIZABETH.

(District Court, D. Washington. February 8, 1902.)

COLLISION—STEAM VESSELS MEETING—NEGLIGENT NAVIGATION.

The steamship Queen Elizabeth, in tow of the tug Tyee, was passing up Puget Sound to the southward from Port Townsend, near the west shore, at about 4 in the morning, when they met the steam schooner Lakme, going out from Tacoma, which came in collision with the Elizabeth. The tug and schooner saw each other's lights when three or four miles apart, and were then nearly head on. Later the Tyee signaled her intention to pass starboard to starboard, which was acceded to, and she immediately starboarded her helm. *Held*, under the evidence, that she was justified in choosing the outside course in passing with her tow, owing to the nearness to the shore, and that neither she nor the Elizabeth were in fault, but that the fault for the collision rested entirely upon the Lakme, for being in charge at the time of an unlicensed and incompetent mate and too close in shore, for porting her helm, instead of starboarding, after answering the signal, and changing only when the vessels were in close proximity, and in failing to reverse at once when the danger of collision became apparent.

In Admiralty. Cross actions for collision.

Preston, Carr & Gilman, for libelant.

Herbert S. Griggs and W. A. Peters, for cross libelant.

Struve, Allen, Hughes, & McMicken, for respondent.

HANFORD, District Judge. For convenience in designating the different parties to these suits, the Queen Elizabeth Company, owner of the ship Queen Elizabeth, will be referred to as the "libelant"; Charles Nelson, owner of the steam schooner Lakme, will be referred to as the "cross libelant"; and the Puget Sound Tugboat Company, owner of the steam tug Tyee, will be referred to as the "respondent." The first suit was commenced by the libelant against the Lakme to recover damages sustained in a collision between the Lakme and the British ship Queen Elizabeth, which occurred between 3 and 4 o'clock on the morning of April 14, 1900, in the vicinity of Point No Point lighthouse, on the west side of Puget Sound;

the Lakme being at the time bound from Tacoma to San Francisco, and the Queen Elizabeth being towed by the steam tug Tyee from Port Townsend to Port Blakely. The cross libelant charges responsibility for the collision upon the Tyee, and claims damages for the injury sustained by the Lakme.

In order that the full effect of some of the testimony introduced in behalf of the cross libelant may be appreciated, a map showing the contour of the shores of Puget Sound from Foulweather Bluff to a point south of West Point lighthouse is here inserted.

The night was clear, and each of the vessels carried all the lights required, though there is a dispute as to whether the colored lights on the Lakme were arranged properly, so as to show from dead ahead to two points abaft the beam, as the law requires. It is admitted, however, that the vessels were seen approaching each other by the officers in charge of both the Tyee and the Lakme, when they were distant from each other 3 or 4 miles; but the parties differ with respect to the exact location of the vessels when their lights became visible to each other, and at the time of the collision. All agree, however, that the collision occurred south of Point No Point light-house, a few minutes after the Tyee and the Queen Elizabeth had passed that point. The speed of the Lakme was 7½ miles per hour, and the Tyee, with her tow, was making 8 or 9 miles per hour. The Lakme was in charge of her second mate, her captain and the first mate being asleep, until the mast head lights of the Tyee were seen, when the captain was called and told that they were near Point No Point; but he was not informed that the other vessels were seen ahead, and he did not come out on the bridge until it was too late to avoid the collision. The second mate of the Lakme did not have a license or certificate entitling him to be employed as an officer of a steam vessel, either as master, pilot, or mate, and there was not at that time any licensed pilot on duty. The facts recited so far are either admitted or established by uncontradicted evidence. The particular circumstances and movements of the vessels immediately preceding the collision are stated in the evidence of the officer who was in charge of the Tyee as follows:

The Tyee took the Queen Elizabeth in tow, and started from Port Townsend southward, between 1 o'clock and 2 o'clock a. m., and reached Point No Point in about two hours. As she was coming around Point No Point, the lights of the Lakme were seen for the first time. The Tyee and the ship in tow made a curve around Point No Point until their position was proximately one mile from the west shore of Puget Sound, and then took a straight course, steering southeast. When the Tyee's helm came to steady on this course, the Lakme appeared to be straight ahead, but steering an irregular course, so that all her lights were visible at times, and then the red light and green light alternately disappeared. Four minutes before the collision, when the steamers were about one mile apart, and when the Lakme was showing her green light, the Tyee signaled, giving two blasts of her whistle, indicating her purpose to pass on the starboard side. This was immediately answered by two blasts from the Lakme. The pilot of the Tyee then put her helm hard to starboard and she swung to port. At the same time the Lakme, instead of turning to port promptly, as the signals indicated that she should do, swung around to starboard so that she showed her red light, and came on directly in the way of the other vessels, but steadied up when she came near to the Tyee, when the witness called out: "Are you crazy or what? Starboard your helm! Starboard your helm!" The two steamers passed each other starboard to starboard; the Lakme going astern of the Tyee. Her stem caught the steel towline, and she then swung to port, and went

slipping along the towline until she struck the Queen Elizabeth on the port side of her bow. The towline parted just at the time of the collision.

In the testimony of this officer, he gives as the reason for sounding two blasts of the whistle for a passing signal that they were near to shore on the right-hand side, and, the Tyee having the burden of a ship in tow, it was safer for her to pass the other steamer on her starboard side, because at that place the tide sets in toward the shore. The testimony of the pilot who was in charge of the Tyee, above narrated, is corroborated by the quartermaster, who was in the pilot house steering the Tyee. It is consistent with all the evidence on the part of the libelant and of the respondent, and it harmonizes with the undisputed facts that the only signals given from one steamer to the other were two blasts of the Tyee's whistle, answered by two blasts from the Lakme, and that the Lakme did pass on the starboard side of the Tyee, and her port bow struck the port bow of the Queen Elizabeth.

On behalf of the cross libelant, the captain of the Lakme testified that when he came on the bridge, after hearing the two blasts from the Tyee, and the answer given by the Lakme, the Tyee was just crossing the bow of the Lakme. The first thing he did was to inquire as to the position of the helm, and was told that it was hard a-starboard, to which he responded, "Keep her there." The Lakme was then turning slowly to port, and the Queen Elizabeth was still off her port bow, and, seeing that a collision was inevitable, he ordered the engines stopped and the helm hard a-port. He did not order the engines reversed, because the propeller was liable to get foul of the towline. As to these matters, I can find no conflict between the testimony given by the captain and the testimony for the other parties. There appears to have been time enough to change the wheel from hard a-port to hard a-starboard, while the captain was coming from his cabin. If the Lakme had been swinging to starboard on a port helm, that movement would place her so that the Queen Elizabeth would appear to be off her port bow, and the fact that she was turning to port slowly with her helm hard a-starboard corroborates the testimony tending to prove that she was not given her starboard helm until the two steamers were very close to each other. The captain does, however, give his estimate of the distances from the place where the vesels met to Point No Point, and to the west shore opposite, which, if accurate, would locate the place of the collision one mile, or a little more than a mile, further from the shore, and one mile, or a little more than one mile, nearer to Point No Point, than indicated by the testimony of the witnesses who were on the Tyee; and the difference in the location would tend to support the contention of the cross libelant that the Tyee was in fault for giving two blasts of her whistle and going to port, instead of observing the general rule of the road, requiring vessels meeting end on, or nearly so, to turn to the right and pass each other port to port. But, considering the fact that the captain had no time to study the situation after coming on deck, and that his mind must have been fully occupied with other things, it is not probable that he could

have made an estimate of the distances with as much accuracy as could the pilot of the Tyee, who knew the route, had time for observation before there was any occasion for excitement, knew the speed his vessel was making, took notice of her compass, and ordered her courses.

The first mate of the Lakme was asleep before the collision occurred. Both sides called him as a witness; but, as I am not obliged to decide the disputed question with respect to the shape and construction of the screens or boxes in which the Lakme's colored lights were placed, I do not regard his evidence as being of any importance. The man who steered the Lakme has not been called as a witness. So the case for the cross libelant depends mainly upon the testimony of her second mate, who was in charge of the deck, and the man who was on duty as lookout; and I regard the testimony of both of these witnesses as being entirely unworthy of belief. By way of illustration, the lookout, upon his examination in chief, conducted by the proctor for the cross libelant, testified as follows:

"Q. How long after you reported the light on the port bow was any signal given by any ship? A. A few minutes after he gave us two whistles. Q. Who gave? A. The tugboat gave us two whistles first. Q. What was done then? A. We answered the two whistles back again, and turned the wheel over. Q. What way was the wheel turned when the whistle was given? A. I was steering straight. After the whistle came, he turned to the port. That called for hard a-starboard. It was turned to the port. Q. You put your helm hard a-starboard? A. Hard a-port. Q. When the two signals came? A. When the two signals came. * * * Q. After the tug blew her two whistles, did she make any change in her course? A. Not before we came close to them. We made the change. Q. What change did she make? A. She turned the wheel to port, too. Q. What way did she come? A. She came to cross our starboard bow. Q. She came to cross your starboard bow? A. Yes."

In answering other questions on his direct examination, this witness also testified that the order given by the second mate to the man at the wheel, after the signals had been given, was "Hard a-starboard!" and that the order was obeyed promptly; and on cross-examination, answering a direct interrogatory, he made this statement: "Yes, sir; our wheel was put hard to starboard." These contradictory statements make it impossible to ascertain from the testimony of this witness whether the Lakme's wheel was first turned to starboard, or to port, after the signals were exchanged. I would not reject his evidence for a mere inadvertent misstatement; but, taken as a whole, it is confused and unsatisfactory.

The Lakme left Tacoma after 9:30 p. m., the evening preceding the collision, and her log shows that she passed West Point lighthouse at 1:40 a. m. In his deposition, the second mate says, in effect, that he was the officer in charge of the deck from midnight until the time of the collision; that he made an entry in the log of the time of passing each point; that the speed of the Lakme was 7 miles or 10 miles an hour; that at 12 o'clock, when he went on deck, she must have been 100 miles from Tacoma; that he did not know what courses were steered after passing West Point, except that his last course was west half north; that she was kept in the middle of the

channel; that he first noticed the Tyee and the Queen Elizabeth when they were coming around Point No Point, 3 or 4 miles ahead of the Lakme; that he then saw only the Tyee's masthead lights; that he did not see her starboard light until she crossed the Lakme's bow; that, after rounding the point, the Tyee was two points off the port bow of the Lakme, and showing her red light. I now quote from his deposition the following questions and answers:

"Q. What, if anything, did you do with reference to steering your own vessel at that time? A. We were steering clear. I did not do anything at that time, until we got a little closer. She was still on our port bow, when I ported our helm to give myself a little more sea room. Q. That would throw you further off to starboard? A. Yes, sir; but, even if I had kept on my course, we would have gone perfectly clear. When she got close to us, she was about a point on our port bow. * * * Q. What happened after that with reference to signaling? A. There was no signaling at all. He was coming on our port bow. I had my hand up to pull the whistle, when he blew two, and, of course, I answered him with two. I said, 'Hard a-starboard!' The man at the wheel put the wheel hard a-starboard. Q. How long was that after you got back on the bridge and had called the captain before those signals were passed? A. It may have been between three and five minutes. It may have been more, and it may have been less. Q. It may have been less than what? Less than three minutes? A. I could not exactly say. Q. Do you know whether or not you were there any appreciable time? A. I was there, walking up and down the bridge, I should judge, for about five minutes before the captain came up. Q. And during that five minutes what was the course of the two vessels? A. We were going about west half north, I should judge, or west quarter north. I would not be sure."

Then, answering further inquiries as to the distance of the Lakme's position out from shore at the time the signals were given, he made this statement:

"We were right in the center of the stream. We were just coming a midway course down the sound. Q. Did you keep that position up to the time that you ported your helm to give him more room? A. Yes, sir."

By referring to the chart, it will be seen that, if the Lakme was anywhere near the middle of the sound, three or four miles south of Point No Point, and steering a course west a half north, or west a quarter north, she would have been heading directly for the west shore, and any steamer showing a red light off her port bow would have been clear to the south, and standing on a course which would have made a collision impossible, unless one of the steamers had turned and chased the other. The statement that the Lakme had traveled 100 miles in 2½ hours also shows the witness to be stupid and reckless. On cross-examination, this officer reaffirmed the statement that, after the tug rounded the point and straightened up on a southerly course, the Lakme was heading west half north, and later, on cross-examination, other questions were propounded and answered as follows:

"Q. How far were you apart when you first ported your helm? A. We must have been probably a mile. Q. Then you changed from west half north to what course? A. West by south, just to give myself a little more sea room. Q. You changed from west half north to west by south? A. Just about that. Q. How could you change from west half north to west by south with a ported helm? A. With a starboard helm. Q. That is not what I asked you. You said you ported your helm to give yourself

more sea room. A. Yes, sir. Q. And changed from west half north to west by south? A. Something about that. Q. With the port helm, and then the tug and Lakme were about a mile apart when you ported your helm? A. Yes, sir."

He also testified, on cross-examination, that, when the Tyee blew two whistles, he supposed that he was obliged to answer with two. The testimony of this witness in its entirety shows the man to be ignorant of the duties of an officer of a steam vessel, and entirely incapable of giving an intelligent report of the manner in which he handled the steamer preceding the collision, and I find no trustworthy evidence in the case with respect to the material facts to be weighed against the testimony of the pilot and quartermaster of the Tyee.

In the light of all the evidence, I find the following facts to be fully proven: The Lakme, before meeting the other vessels, was out of the proper course for a vessel going north, being too far over toward the west shore, instead of being on the right-hand side of the stream. She was steered negligently. Her wheel was turned the wrong way after answering and assenting to the passing signals, and without any excuse she failed to stop and reverse her engines, when she came into dangerous proximity to the other vessels, until it was too late to avoid striking the Queen Elizabeth. I consider that the evidence proves the Lakme to have been in fault in the following particulars: (1) For being under way without being in charge of a licensed pilot. (2) For approaching Point No Point from the southward, in the way of vessels going in the opposite direction, without any necessity or reason for being so far over toward the west shore. (3) For steering an irregular course after the lights of the Tyee and her tow had come into view ahead of her. (4) For porting her helm when she was distant from the Tyee one mile or less, without having previously given the proper signals indicating her purpose to change her course to starboard. (5) For being too slow in putting her helm hard a-starboard, after answering and assenting to the signal of the Tyee, indicating that the steamers were to pass each other starboard to starboard. (6) For not stopping and reversing her engines promptly when the danger of a collision became apparent. In view of the situation shown, I consider that the Tyee had a right to choose the course to be taken to avoid a collision, and was justified in signaling to pass starboard to starboard, and in changing her course in accordance with that signal after it had been assented to by the Lakme. The Tyee, therefore, did not commit any error which contributed to cause the collision, and the Queen Elizabeth is also shown by the evidence to be free from any fault in the matter.

The evidence proves that the damages to the Queen Elizabeth, including demurrage for her delay while necessary repairs were being made, amounts to the sum of $4,500. A decree will be entered in favor of the libelant for said amount, with legal interest from the 1st day of May, 1901, and costs.